NEWMAN, Circuit Judge,
dissenting from denial of petition for rehearing.
Nokia requests rehearing, and again raises the question of whether InterDigital has the statutory right to bring this exclusion action, for InterDigital does not manufacture the patented invention in the United States, and no domestic industry produces the items for which exclusion is sought. The license that InterDigital seeks to impose on Nokia, on threat of exclusion of importation, is not a license to manufacture any patented product in the United States; it is a license to import products made in foreign countries. The panel majority errs in holding that Congress intended to authorize access to the ITC exclusion remedy in such circumstances. That is not the purpose of the “licensing” amendment to Section 337 of the Tariff Act.
The licensing amendment did not eliminate the domestic industry requirement for access to the ITC remedy of exclusion. Indeed, the amendment confirmed that requirement. The panel majority erred in holding that the domestic industry requirement is met by licensing the importation of foreign-made products. The purpose of the licensing amendment to Section 337 was to enlarge the benefit and incentive to domestic industry by giving licensors access to ITC exclusionary procedures; the purpose was not to eliminate the requirement of domestic manufacture of the licensed articles. The panel majority continues to err, in reinforcing its theory that
Section 337(a)(3) makes clear that the required United States industry can be based on patent licensing alone; it does not require that the articles that are the objects of the licensing activities (i.e., the “articles protected by the patent”) be made in this country.
InterDigital Common’s, LLC v. Int’l Trade Comm’n, 690 F.3d 1318, 1329 (Fed.Cir. 2012) (majority opinion).[1] To the contrary, *1305 the legislative record of Section 337(a)(3) does not “make clear,” or suggest, or even hint, that “articles protected by the patent,” Section 337(a)(2), need not be made in this country in order for the patentee to obtain exclusion of foreign-made infringing products.
The purpose of the 1988 amendments to Section 337 was to permit patentees that do not themselves manufacture their patented products, such as universities and others that perform research or engineering, to have access to the Section 337 remedy. The 1988 amendments did not remove the requirement that “articles protected by the patent” must be produced in the United States; the amendments were designed to enlarge the incentive for domestic production, not to eliminate it.
The panel majority insists that Congress intended to make the ITC remedy of exclusion available to exclude foreign manufactures in the absence of domestic production, although the patentee in this case does not want to exclude the foreign product, but only to obtain a fee for its importation. My colleagues hold that it is irrelevant that no domestic industry is producing, or planning to produce, the patented articles, directly or under license, stating that Congress “clearly” intended to abandon the purpose of Section 337 to serve domestic production. However, that is the purpose of Section 337. The legislative record is clear that the “licensing” amendment to Section 337 was enacted to encourage and support domestic production of patented products. It is time for file court to correct its error, not to reinforce it.
I
The “licensing” amendment
Section 337 was enacted in the Tariff Act of 1930, to provide an expedited and .efficient remedy against foreign-made infringing products by authorizing exclusion of such products from importation, as an additional or alternative remedy for infringement, but with certain caveats. Thus the statute originally required that in order to obtain the remedy of exclusion there must not only be a domestic industry practicing the patent, but also that the domestic industry must be “efficiently and economically operated,” and must be injured by the importation. The 1988 amendments facilitated access to exclusion by eliminating the need to prove injury and efficient and economic operation of the domestic industry, and 'extended the exclusion remedy to patentees such as universities and research institutions that do not themselves manufacture goods.
The legislative history of the 1988 amendments cannot be read as proposed by the panel majority. The Tariff Act of 1930, in its current codification at 19 U.S.C. § 1337 as amended, declares unlawful:
§ 1337(a)(1)(B) The importation into the United States, the sale for importation, or the sale within the United States *1306 after importation by the owner, importer, or consignee, of articles that—
(i) infringe a valid and enforceable United States patent or a valid and enforceable United States copyright ...;
(a)(2) Subparagraphs (B) [patent and copyright], (C) [trademark], (D) [mask work], and (E) [design] of paragraph (1) apply only if an industry in the United States, relating to the articles protected by the patent, copyright, trademark, mask work, or design concerned, exists or is in the process of being established. (a)(3) For purposes of paragraph (2), an industry in the United States shall be considered to exist if there is in the United States, -with respect to the articles protected by the patent, copyright, trademark, mask work, or design concerned—
(A) significant investment in plant and equipment;
(B) significant employment of labor or capital; or
(C) substantial investment in its exploitation, including engineering, research and development, or licensing.
The 1988 amendments arose from an ITC copyright decision in 1986, Certain Products With Gremlin Character Depictions, Inv. No. 337-TA-201, USITC Pub. 1815 (March 1986) (Final Determination), 1986 ITC LEXIS 313. The complainant Warner Brothers sought exclusion of products that infringed its copyrighted Gremlin characters. The ALJ held that the domestic industry requirement of Section 337 was met, stating that Warner Brothers “licensed 48 domestic companies to produce a wide variety of goods containing GREMLINS character depictions [including] hats, lunch boxes, painter caps, jerseys, posters, ‘Colorforms,’ playsets, toy cars, card games, patterns for costumes, blankets, baby sleepers, records, pajamas, and puffy stickers, to name just a few.” Gremlin, Inv. No. 337-TA-201 (Sept. 12, 1985) (Initial Determination), 1985 WL 303620, at *10. The full Commission reversed, holding that “the licensing activities of Warner with respect to the ‘Gremlin copyrights’ do not constitute a domestic industry under section 337.” 1986 ITC LEXIS 313, at *158.
Congressional hearings were held to consider this and other issues that had arisen concerning Section 337. The record shows general agreement among industry, government, and legislators, as they cooperated to adapt the ITC exclusion provision to circumstances such as in the Gremlin case, where the owner of the copyright was not itself a manufacturer of the products licensed to use the copyright. The legislative purpose was to assist United States industry in protecting against infringing foreign-made goods, by providing a ready remedy against importation, rather than obliging the owner of the property right to wait to act against infringing goods after they reach the marketplace.
House Judiciary Subcommittee Chairman Kastenmeier, the primary sponsor of the legislative changes, initiated extensive study and hearings. Reported at Intellectual Property and Trade: Hearings Before the Subcomm. on Courts, Civil Liberties, and the Administration of Justice of the House Comm, on the Judiciary (“House Judiciary Hearings”), 99th Cong. 551 (1986); 132 Cong. Rec. H1783 (Apr. 10, 1986), he stated that legislation was needed
to modify the domestic industry requirement by allowing complaints to be filed by persons who have made a substantial investment in facilities or activities relating to the exploitation of a patent [or other intellectual property], including research and development, licensing, sales, and marketing. This adjustment will assure continued access to the ITC *1307 by entities, including universities, who have a substantial stake in the United States.
This change would also avoid the unfortunate results which have occurred in some recent cases, such as Gremlin, where — because of pertinent legislative history explaining the current law — the ITC has denied relief notwithstanding the existence of a large service industry exploiting the intellectual property right within the United States. Finally, such a change will enable universities and small businesses who do not have the capital to actually make the good in the United States to still have access to the ITC forum for the protection of their rights.

Id.

Chairman Kastenmeier stated that his “modest” proposal does not “delete the domestic industry requirement.” Trade Reform Legislation: Hearings Before the Subcomm. on Trade of the House Comm, on Ways and Means (“House Ways and Means Hearings”), 99th Cong. 818 (1986). He objected to simply removing the domestic industry requirement from the statute:
Without the “domestic industry” requirement, this access [to ITC exclusion] would not be predicated on any investment in the United States. This change cannot be said to be an attempt to protect American jobs, quite the contrary is true.
Id. at 824. During the same hearings, Representative Carlos J. Moorhead explained why amendment to the existing statutory text was needed:
The industry test ... prevents universities and research institutions from using the ITC for enforcing their patents, copyrights and trademarks because they are not in business.
Id. at 849. Representative Moorhead did not suggest that Section 337 had any purpose other than to support domestic manufacture.
ITC Chair Paula Stern stressed the role of intellectual property rights in production and in economic growth:
I am concerned that the proposed legislation can be read to elevate the protection of intellectual property rights — regardless of whether they are ultimately commercially exploited — over other important public interest goals. After all, society benefits even more from the fruits of the inventor when intellectual property rights are exploited through the efforts and capital of the entrepreneur. It is this production-related activity which in turn spawns economic growth. Society does not benefit directly from protecting a particular invention unless that idea is ultimately exploited....
I therefore believe that to be consistent with the public-interest purpose of section 337, the domestic industry and injury standard should be maintained, and should continue to require more than mere ownership of a U.S. intellectual property right.... Universities are not domestic industries.
House Judiciary Hearings at 5-6, 69. Representative Moorhead agreed, but pointed out the role of university inventions in potential industrial activity:
But the university really does not have a very good remedy anyplace at the present time.... [Courts] hear them, but there is so much time that passes before they actually get into court that the purpose of the invention and the profit has been reaped abroad and it is too late to do anything about it.
What do you do about a new cancer treatment in the biotech area like interferon or something of that kind? There is no industry yet at this time, it is *1308 something that there will be a great industry.
Id. at 70.
As the legislative process progressed, the hearing records contain testimony and statements of representatives of industry, government, the academic community, and legislators. I present a sampling of testimony specific to the proposal to provide licensors with access to ITC exclusionary procedures; no witness disputed that Section 337 is intended to support domestic manufacture, not imports of foreign manufacture.
Michael H. Stein, for Coming Glass Works and the Semiconductor Industry Association, House Ways and Means Hearings at 655:
[T]he requirement that a complainant establish that there is a U.S. industry exploiting the intellectual property should remain. The purpose of the ITC is to adjudicate trade disputes between U.S. industries and those that seek to import. Moreover, the issuance of an exclusion order makes little sense if it does not protect an industry within U.S. borders.
Richard C. Witte, Proctor & Gamble Co., testifying as Vice President of Intellectual Property Owners, Inc. (IPO), explained that including “licensing” could facilitate use of the patented technology:
Owners of patents in rapidly changing high-technology industries should not be denied relief against foreign competition if steps are being taken to establish an industry in the U.S. Some industries in the U.S. built on new technologies may never come into existence if patent owners cannot fend off free riders.
We believe if an intellectual property owner has made a significant investment in the United States, that should satisfy the industry requirement. Significant investments in research and development should qualify. It should be made clear also that universities and other intellectual property owners who license their rights to manufacturers are eligible to obtain relief.
Intellectual Property Rights: Hearings Before the Subcomm. on Int’l Trade of the S. Finance Comm. (“Senate Hearings”), 99th Cong. 193-94 (1986). IPO therefore supported access to ITC remedy for domestic organizations whose function it is to do research, and license the use of that research to manufacturing industries in the United States. Id. at 188.
Similar positions were presented on behalf of many technology-based corporations. E.g., Thomas D. Kiley, Vice President, Genentech, Inc.:
Under current ITC jurisprudence, it is open whether relief is available to a patentee who does not himself manufacture and sell the goods involved. Under present law the rights of universities and individual inventors before the International Trade Commission are unresolved.
House Judiciary Hearings at 87.

Roy H. Massengill, General Patent Counsel, Allied Signal, Inc.:

We do not object to having some sort of business entity or a type of industry where there is an investment. Universities I think are a special case that would have to be an exception.
Id. at 91.
All witnesses stated that the purpose of extension of the Section 337 remedy to entities such as universities and research institutions is to accommodate their role as licensors to domestic industry — not to authorize ITC exclusion of foreign-made products when no domestic industry exists or is “in the process of being established.” Section 337(a)(2). Senator Frank Lauten-berg, a co-sponsor of the corresponding Senate bill, stated:
*1309 The current law throws up barriers that have blocked relief for a range of firms, from the New York inventor of fiber optic waveguide to a Tennessee maker of softballs, to the California movie studio that licenses the Gremlin character.
House Ways and Means Hearings at 572.
The panel majority states that Senator Lautenberg “explained that it was not appropriate to require production in the United States in order for section 337 to be available as a remedy.” Rehearing Op. 1300-01. That is incorrect. Senator Lau-tenberg stated that he sought to provide protection under Section 337 for “[r]e-search-based firms [that] are plowing millions of dollars into the development of new products and processes,” and companies that spend hundreds of millions of dollars “to develop and bring a new pharmaceutical product to market” or create a “new family of semiconductor chips.” 133 Cong. Rec. S9937 (July 15, 1987). Senator Lautenberg did not propose elimination of the domestic production requirement of Section 337; he stated that “[fjor those who make substantial investments in the creation of intellectual property and then license their creations, there should be a remedy,” and that domestic industries should be protected from piracy. Id.
U.S. Trade Representative Clayton Yeutter presented the Administration position, that it should be made easier for domestic industry and universities to have access to the Section 337 remedy by eliminating the industry test of “efficient and economic operation”:
The Administration also supports elimination of the industry test provision of the current law, another source of needless uncertainty.... The industry test also prevents universities and research institutions from using the ITC for enforcing their patents, copyrights and trademarks because they are not in business.
House Ways and Means Hearings at 354.
Witnesses explored the trade policy aspects of Section 337. Professor Robert E. Hudec of the University of Minnesota Law School discussed the relation of the proposed changes in Section 337 to the GATT (General Agreement on Tariffs and Trade), stating his “views of what the GATT problems are with regard to the present section 337 and the proposed reforms.” House Judiciary Hearings at 172-73.
Chairman Kastenmeier made clear that the purpose of the licensing amendment was to benefit entities “who have a substantial stake in the United States.” Id. at 551. The final legislative reports of both Houses of Congress are explicit: H.R.Rep. No. 100-40 (House Report), at 157 (the amendments “encompass universities and other intellectual property owners who engage in extensive licensing of their rights to manufacturers.”); S.Rep. No. 100-71 (Senate Report), at 129 (the amendments “encompass universities and other intellectual property owners who engage in extensive licensing of their rights to manufacturers.”).
Other amendments deleted the requirements of establishing injury to the domestic industry, and that the industry must be shown to be efficiently and economically operated, as I discuss post. However, the requirement that there must be a domestic industry, in existence or in the process of being established, was not touched. After two years of hearings, deliberation, and interaction among the concerned communities, Section 337 was amended to these effects.
Despite this legislative record, the panel majority held that the legislative history “strongly supports]” the view that the 1988 amendments eliminated the requirement of domestic production. InterDigi- *1310 tal, 690 F.3d at 1329. The panel majority now repeats that error. However, there is no support for their statement that the legislation “made clear that it would not be necessary for a complainant to prove that patent-protected goods were being produced in this country.” Rehearing Op. 1302. Domestic manufacture, actual or in the process of being established, is explicitly required in the present statute. No contrary position was “made clear” in the legislation.[2]
Section 337(a)(2) requires that there be “articles protected by the patent,” that is, articles made or in preparation to be made in the United States. The amended statute authorizes a licensor to bring an ITC exclusion action, for the purpose of the amendment is to give a licensor access to the remedy of exclusion of foreign-made infringing products, as an alternative to district court litigation after importation of the infringing products.[3] The purpose is to protect the licensor’s income and its licensees. The purpose is not to facilitate importation of foreign-made products.
The domestic industry requirement is satisfied only if “[t]he owner of the property right [is] actively engaged in steps leading to the exploitation of the intellectual property, including application engineering, design work, or other such activities.” Senate Report at 130 (“Because this statute is not intended to protect holders of U.S. intellectual property who have only limited contact with the United States, the Committee does not want to see this language used as a loophole to the industry requirement.”); House Report at 157 (same). Section 337 does not depart from the requirement that there be a domestic industry to produce the patented articles, whether under its own patents or by license.
The panel majority plucks out of context a statement that the amended statute “does not require actual production of the article in the United States if it can be demonstrated that substantial investment and activities of the type enumerated are taking place in the United States.” Senate Report at 129; House Report at 157. The majority omits the ensuing sentence, that “[t]he definition could encompass universities and other intellectual property owners who engage in extensive licensing of their rights to manufacturers.” Senate Report at 129; House Report at 157. The Reports state that when the licensor does not itself manufacture the patented articles, the licenses are “to manufacturers.” Manufacture under a licensed United States patent is manufacture in the United States.
As I discuss in Part III, implementation of this “licensing” amendment became erratic in the ITC and in this court, as the terse statutory language led to imprecision of interpretation. At the time of consideration of these amendments the major issue was not the “licensing” aspect, which was uncontroversial, but the other proposals, *1311 particularly whether to eliminate the longstanding requirements that the domestic industry is injured by the importation, and is efficiently and economically operated. I turn briefly to this aspect of the 1988 amendments.
II
“Efficiently and Economically Operated” Domestic Industry
Section 337 as enacted in 1930 contained the requirement that the complainant must establish both that the domestic industry is injured by the infringing imports, and that the domestic industry is efficiently and economically operated. The proposal to eliminate these requirements occasioned diverse views, as patent policy interacted with trade policy and competition policy. These aspects occasioned independent discussion, with somewhat less unanimity than for the licensing amendment. Following is a sampling of the hearing record:
ITC Chair Paula Stem: “The present efficient and economic operation requirement may enlarge the discovery record and the hearing record with concomitant additional costs to the parties and the Commission. It may also place large amounts of confidential information at risk. However, using our trade statutes ... in a situation where the domestic industry is inefficient and will not be economically viable is a waste of resources.” House Judiciary Hearings at 26. Chairman Stern proposed modifying, but not eliminating, the “efficiency” requirement for the domestic industry.
Senator William V. Roth, Jr.: “As I see it, the priority for us in the committee in this effort to amend section 337 is the injury issue. Right now the law requires that infringing imports threaten an efficient and economically operated domestic industry with ‘destruction or substantial injury.’ But why should an owner of an intellectual property right like a patent have to demonstrate destruction or substantial injury if the patent is infringed?” Senate Hearings at 2.
Senator Frank Lautenberg: “The main problem is this: it isn’t enough to prove piracy. One has to prove it hurts. One has to prove that imports would destroy or injure a U.S. industry ... an industry that is efficient and economically operated.” Id. at 38.
Senator John C. Danforth: “My own view is that — and I am a cosponsor of the bill — if counterfeited material is being shipped into the United States it should be very easy to get relief. I view that as really a per se type violation of fundamental standards of how we want to do business in this country, and that it should not be a lengthy process of trying to prove whether you are injured and whether your industry is operating efficiently and whether your industry is impacted.” Id. at 128.
Representative Moorhead discussed the difficulty of proving injury:
It is very, very difficult to prove damage to an industry where you have a great invention, one that is obviously going someplace, going to develop a great industry, where the industry has not been developed as yet, because there has not been time, and before that industry can get off the ground here, they are selling the same product from abroad.
House Judiciary Hearings at 69. Representative Moorhead stated: “Also an inventor would not have to prove that its industry is efficiently and economically operated. Some small high-technology firms may not have a chance to get started and to become economical before they are challenged by pirates. They are unable to seek relief before the ITC just as universities and individual inventors are unable to seek relief before the ITC.” Id. at 2.
*1312 Harvey Bale, Assistant U.S. Trade Representative, for the Administration: “[I]n our opinion the need to establish an efficiently and economically operating industry imposes a burden on U.S. intellectual property owners which makes it harder for them to enforce their rights.... The time, energy, and money of the patent owner, the respondent, and the Commission are expended to determine whether a real ‘efficiently and economically operated’ industry exists.” Id. at 48.
Thomas D. Kiley, Vice President, Gen-entech: “The necessity of demonstrating injury to an efficient and economically operated industry ... is a burden beyond those present in conventional patent actions. It is a burden not shared by process patent holders in many other countries.... And foreign industry will invariably be more efficiently and economically operated if it can forego the burden and expense of original research.” Id. at 87.
Roy H. Massengill, Allied Signal: “I think that the requirements that industry establish injury through showing they have an efficient and economically operated industry is too burdensome on a paten-tee. Moreover, there are a lot of research projects as well as universities that cannot meet that requirement.” Id. at 93.
Michael H. Stein, Coming Glass and the Semiconductor Industry Association: “Section 337 should also be amended to eliminate the requirement that a complainant prove that the U.S. industry is ‘efficiently and economically operated.’ This element is vague, highly subjective, and to its credit, the U.S. International Trade Commission has never denied relief on this basis. This element adds additional needless cost to the already high price of section 337 relief, and subjects] U.S. industries to extensive discovery by counsel for foreign respondents.” Id. at 244. “The injury and efficient and economic operation requirements of section 337, designed for the antidumping context originally intended in the statute, make no sense in the intellectual property arena.” Id. at 246. “For example, how does one establish that a new, emerging industry is efficiently and economically operated?” Id. at 251. “We are aware of little or no opposition to the removal of this requirement.” Id. at 252.
Richard C. Witte, for IPO: “We support eliminating completely the requirement that the ITC must find the U.S. industry to be efficiently and economically operated. For example, it may be difficult for a newly established technology based industry to show that it is efficient.” Senate Hearings at 187-88.
William T. Archey, for the United States Chamber of Commerce: ‘We support eliminating the requirement that the ITC must find the U.S. industry to be ‘efficiently and economically operated’ as a condition for relief in intellectual property cases particularly since it may be difficult for a newly established, technology-based industry to show that it is efficient.” Id. at 247-48.
Representative Kastenmeier initially advocated modifying, but not eliminating, the “efficiently and economically operated” requirement: “Third, transfer the economically and efficiently operated criteria from being an element of the complainant’s case to a public interest factor to be evaluated by the ITC only in determining whether to approve a remedy. This change alone should limit the real and potential discovery abuse which can occur under current law.” House Judiciary Hearings at 551.
To the extent that there was any difference of opinion at the Hearings, it related to the requirements of showing injury and efficient and economical operation. Although the panel majority makes much of what they call “the compromise,” they do not explain what was compromised. The *1313 statement on behalf of the Monsanto Company, cited by the panel majority to illustrate the purported “compromise,” shows no proposal that the domestic industry requirement should be removed. Donald H. Swan, Vice President, Monsanto Co., testified:
We believe that you should retain the requirement that U.S. industry be involved. That is, that the complainant has substantial investment in U.S. manufacturing, R & D, creative development or marketing development facilities. This would include universities and pure research facilities.
Senate Hearings at 175. However, Monsanto supported eliminating the requirement of proving injury and efficient and economical operation:
We strongly support proposed improvements to Section 337 to make it more practical to bring cases in the ITC to exclude imports which infringe U.S. patents, trademarks, and copyrights. When this type of action is applied to an infringement case, as opposed to the more usual injurious import of goods, clearly issues such as whether the complainant is “efficiently and economically operated” or whether “injury” can be proven are irrelevant. Infringement is by definition an injury to intellectual property rights and whether the innovator’s operation is efficiently run is meaningless in an intellectual property rights case, as opposed to a commodity manufacturing case.
Id. at 179-80. My colleagues’ statement that the legislators compromised away the domestic industry requirement is without foundation.
Ill
Inconsistent Precedent
The panel majority states that “the Commission has consistently construed subparagraph (C)” so that licensing alone is deemed to be a domestic industry, with no need for domestic licensed manufacture. Rehearing Op. 1298. That is incorrect, for the Commission has often held that licensing alone does not satisfy the domestic industry requirement, even as the Commission has also reached inconsistent holdings.
In Certain Methods of Making Carbonated Candy Products, Inv. No. 337-TA-292, USITC Pub. 2390 (June 1991), the Commission addressed the then-recently enacted Section 337(a)(3). The complainants included the patent holder, its exclusive licensee, and “a partnership established to manufacture, sell, and distribute” the patented carbonated candy. Comm. Op. at 1. The complainants argued that their commercial production of carbonated candy practiced the “essential element” of the patent and therefore satisfied the domestic industry requirement. In rejecting this argument, the Commission ruled that the statutory language “with respect to the articles protected by the patent” “reflects the Commission’s long-standing practice of holding that a domestic industry does not exist if the complainant, or its licensees, is not exploiting the asserted patent.” Id. at 34-35. The Commission “adopt[ed] the ALJ’s finding that the domestic industry does not practice” the asserted patent, id. at 31, and denied exclusion under Section 337.
It is suggested that Certain Dynamic Sequential Gradient Compression Devices and Component Parts Thereof, Inv. No. 337-TA-335, USITC Pub. 2575 (Nov.1992), is an early example of the Commission’s elimination of the domestic production requirement. Rehearing Op. 1298. While the ALJ stated that “a complainant in a Section 337 investigation need not manufacture the product covered by the claims of the patent in order to establish that a domestic industry exists,” the ALJ also *1314 stressed the need for “articles protected by the patent”:
Therefore, the activities set forth in [Section 337(a)(3) ] may constitute a domestic industry only if they are sufficiently related to articles protected by the patent as to constitute an exploitation thereof.
Initial Determination at 59-61 (May 15, 1992). The ALJ held that the complainant’s investments in research and development, engineering, and educational programs did not constitute a domestic industry. Id. at 61. Licensing was not discussed because the complainant had “not engaged in licensing under the [asserted] patent.” Id. at 60 n. 30.
In Certain Integrated Circuit Telecommunication Chips and Products Containing Same, Including Dialing Apparatus, Inv. No. 337-TA-337, USITC Pub. 2670 (Aug.1993), the Commission rejected the argument “that to the extent that a domestic industry with respect to the [asserted] patents is based on complainant’s licensing or research and development activities, the domestic industry requirement is satisfied even if it is found that complainant ... do[es] not practice the [asserted] patents.” Initial Determination, 1993 ITC LEXIS 859, at *87 n. 87. The ALJ stated that “Section 337(a)(2) requires that the domestic industry relate to the articles protected by the patent,” and that the requirement of domestic production “reflects the Commission’s long-standing practice of holding that a domestic industry does not exist if the complainant, or its licensees, is not exploiting the asserted patent.” Id. The Commission adopted the ALJ’s “thorough and well reasoned” analysis. 1993 ITC LEXIS 854, at *25-26 n. 2.
The panel majority states that some of these decisions are “inapposite.” Rehearing Op. 1298. However, they all apply and interpret Section 337(a)(3). In Dialing Apparatus the ALJ, approved by the full Commission, stated:
[T]he administrative law judge has found no authority for the conclusion that a mere license under a patent, where the licensee has not fabricated any product which a complainant contends embodies the invention described in said patent, is adequate to establish a domestic industry.
1992 WL 811431, at *11-12 n. 25. This statement is directly apposite.
However, the Commission has been inconsistent. A conflicting Commission decision is Certain Digital Satellite System (DSS) Receivers and Components Thereof, Inv. No. 337-TA-392 (Oct. 20, 1997). The ALJ found that the complainant’s licensing activities were sufficient to satisfy the domestic industry requirement because the complainant (1) employed five people to “identify! ], approach[ ], and negotiate] with prospective licensees,” and (2) had “incurred substantial expenditures relating to litigation of its patent rights.” Initial Determination, 1997 WL 696255, at *8. The ALJ stated that “the statute does not require a complainant to manufacture the patented product nor does it require that a complainant show that a product covered by the [asserted] patent is made by complainant’s licensees.” Id., at *8. The full Commission did not discuss this aspect of the Initial Determination. Certain DSS Receivers, Notice (May 13, 1999) (vacating only the ALJ’s invalidity rulings).
The panel majority states that Section 337 requires the investment in licensing to be “substantial” to constitute a domestic industry, and therefore that there is no “concern that the statute will be used to grant a remedy to any domestic patent owner, no matter what the scale of its activities in exploiting the patent.” Rehearing Op. 1299 n. 2. For this proposition, the majority cites Certain Stringed Musi *1315 cal Instruments and Components Thereof, Inv. No. 337-TA-586 (May 16, 2008) (Final Determination). But this case merely illustrates the uncertainty engendered by the majority’s inconsistent statutory interpretation. In Certain Stringed Musical Instruments the Commission denied an independent inventor’s request for Section 337 remedy, although he had spent thousands of dollars to manufacture five different prototypes of his patented tuning device and devoted many years attempting to license his patented tuning technology for domestic manufacture. Comm. Op. at 9-10, 25-27. The Commission held that the inventor had not shown “substantial investment,” although the context showed that the inventor had persistently sought licensees.
A recent ITC decision concerned whether the combination of licensing and litigation expenses could meet the domestic industry requirement, and held that it might, depending on the particular facts. In Certain Coaxial Cable Connectors, Inv. No. 337-TA-650, 2011 WL 7463395 (Nov.2011) the ITC stated that “Congress contemplated that the requirement would cover small companies, such as biotech startups, that license their patents in order to generate sufficient capital to manufacture a product in the future.” Id., at *38. The Commission quoted the statement of Senator Lau-tenberg, who had explained:
For those who make substantial investments in research, there should be a remedy. For those who make substantial investments in the creation of intellectual property and then license creations, there should be a remedy. Let me give one example, there’s a start-up biotech firm in my state. Its product is its patents. It hasn’t reached the stage of manufacture. It doesn’t have the money. But it will reach that point, by licensing its patents to others. Should we deny that firm the right to exclude the work of pirates? Our legislation would say no. A party could get relief if it has made significant investment in R & D, engineering, or licensing.
Id. (quoting 132 Cong. Rec. H1782 (Apr. 10, 1986)) (emphases in original). The Commission stated that “licensing” in Section 337 covers not only licensing to “bring a patented technology to market,” but also activities that “take advantage of the patent, i.e., solely derive revenue” from the patent. Id., at *39. On further determination, the ALJ held that the domestic industry requirement had not been met. Id., at *5 (July 12, 2010). (Commission notice declining to review ALJ’s determination of no domestic industry). This court affirmed, holding in John Mezzalingua Associates v. International Trade Commission, 660 F.3d 1322 (Fed.Cir.2011), that the patentee’s investment in licensing and enforcement activities did not satisfy § 1337(a)(3)(C).
In its brief on the Mezzalingua appeal to the Federal Circuit, the Commission, responding to amici’s argument that only “productive” licensing should be considered relevant to the establishment of a domestic industry, stated that “there is no evidence that Congress considered ... NPEs [Non Practicing Entities] when it amended the Commission’s statute in 1988.... Indeed, the emergence of NPEs in the last 15 years is too recent for Congress to have considered when it amended the Commission’s statute over twenty years ago.” Commission Brief at 59-60 (Mar. 21, 2011). The Commission stated that “the legislative history and the design of the statutory scheme indicates that Congress intended section 337 to cover ‘licensing’ that encourages the productive use of the patented technology.” Id. at 57. This court agreed, stating that “it is clear that Congress had no intention of disposing of the domestic industry requirement altogether.” Mezzalingua, 660 F.3d at 1327. The panel majority’s current ruling in In-terDigital contradicts our own precedent.
*1316 A recent decision cited by my colleagues to show the Commission’s “consistency” actually shows inconsistency. Certain Multimedia Display and Navigation Devices and Systems, Components Thereof, and Products Containing Same, Inv. No. 337-TA-694, USITC Pub. 4292 (Aug. 8, 2011). The panel majority states that the Commission holds that investment in licensing alone may satisfy the domestic industry requirement. Rehearing Op. 1298. The panel majority does not mention the Commission’s statement that the purpose of the licensing amendment is to benefit patentees that license their patents “to manufacturers” or for “production-related activities”:
Section 337(a)(3)(C) was added to benefit domestic entities with limited resources like universities and start-up companies that license their inventions to manufacturers, as well as large entities that produce intellectual property through design and research and development activities in the United States, but outsource production-related activities through licensing.
Comm. Op. at 13 n.9. The Commission “reverse[d] the ALJ’s finding that a domestic industry exists.” Id. at 25.
Yet another recent ITC ruling is consistent with the requirement for domestic manufacture by license. In Certain Integrated Circuits, Chipsets, & Products, Inv. No. 337-TA786, 2012 WL 3610787 (July 12, 2012) (Initial Determination), the ALJ had stated that “where a complainant is relying on licensing activities, the domestic industry determination does not require a separate technical prong analysis and the complainant need not show that it or one of its licensees practices the patents-in-suit.” Id., at *79. However, the ALJ also held that the investment in licensing was not “substantial” within the meaning of Section 337. Id., at *87. On October 10, 2012, the Commission affirmed,[4] denying access to Section 337 exclusion.
It is plainly inaccurate to state that the Commission has “consistently” held that licensing alone satisfies the domestic industry requirement. Rehearing Op. 1298. The conflicting rulings of the Commission itself underscore the need for resolution. And the InterDigital court’s interpretation of Section 337 conflicts with the weight of this court’s precedents, which require domestic production, or preparation to produce, articles protected by the patent. See Crocs, Inc. v. Int’l Trade Comm’n, 598 F.3d 1294, 1306-07 (Fed.Cir.2010) (domestic industry requires “the industry [to] produce[ ] articles covered by the asserted claims.”); Osram GmbH v. Int’l Trade Comm’n, 505 F.3d 1351, 1359 (Fed.Cir. 2007) (there must be a “domestic product” to satisfy the domestic industry requirement); Alloc, Inc. v. Int’l Trade Comm’n, 342 F.3d 1361, 1375 (Fed.Cir.2003) (considering whether the “industry relates to the protected articles.”). The panel majority’s statutory interpretation is a distortion of Section 337. See InterDigital, 690 F.3d at 1330 (holding that InterDigital satisfies § 337 because a domestic industry may consist “purely of licensing activities.”).[5]
*1317 The burgeoning inconsistencies reinforce the need for resolution. At a congressional hearing in July 2012 witnesses pointed out that the ITC forum is often used not to protect domestic manufactures, but to facilitate importation of foreign manufactures. See International Trade Commission and Patent Disputes: Hearings Before the Subcomm. on Intellectual Property, Competition and the Internet of the House Comm, on the Judiciary (“2012 Hearings”) (July 18, 2012). Neal A. Rubin, Vice President of Cisco Systems, testified that:
patent assertion entities often rely upon the domestic activities of their unwilling licensees [to satisfy the domestic industry requirement].... But this statutory language, added by Congress in 1988, should not apply to the ‘revenue-driven licensing’ model.
2012 Hearings (statement of Neal A. Rubin).
At the same hearings, David B. Kelley, IP Counsel of Ford Global Technologies, testified that the purpose of the licensing amendment was to help American jobs and production:
Licensing is permitted in the domestic industry test to allow innovators who don’t make products, like universities, to use Section 337.... This helps create American jobs in product development and manufacturing. On the other hand, [patent assertion entities] obtain and license their patents after a product has come to market, and seek to share in the value already created by others.... While a PAE may have a claim in district court, it should have no place in the ITC, which is intended to protect U.S. industries and jobs, not to allocate existing value among claimants by awarding damages.
Id. (statement of David B. Kelley).
We offer no view on the role of nonpracticing entities in innovative advance, taking note of the complex positions on all sides. The issue before the court is simpler, for it relates solely to the purpose and application of Section 337, whether the licensor is a research establishment such as InterDigital, or any other licensing patent owner. The larger policy aspects are properly before the legislators. It is the judicial obligation to understand the law, to appreciate its purposes as enacted, and to apply the law correctly, in implementation of the legislation:
The purpose of the Commission is to adjudicate trade disputes between U.S. industries and those who seek to import goods from abroad. Retention of the requirement that the statute be utilized on behalf of an industry in the United States retains that essential nexus.
House Report at 157.
The ITC is to adjudicate trade disputes between U.S. industries and those who seek to import goods from abroad. Retention of the requirement that the statute be utilized on behalf of an industry in the United States retains that essential nexus.
Senate Report at 129.
My colleagues depart from the statutory text and purpose, in holding that the statutory requirement of domestic industry does not require domestic manufacture. Rehearing Op. 1303 n. 4. The statute says, twice, that there must be “articles protected by the patent,” § 1337(a)(2), (a)(3), *1318 whether produced by the patentee, or under license from the patentee. The domestic industry requirement is not met by foreign manufactures. That is the issue requiring judicial attention. From the panel’s denial of the petition for rehearing, I respectfully dissent.

. The majority now argues that “a sufficiently substantial domestic licensing industry will need to license its technology to a manufacturer somewhere,” but not necessarily in the United States. Rehearing Op. 1303 n. 4. This contrasts with the panel’s previous holding in this case that a "domestic industry" can be *1305 based on licensing activity alone. 690 F.3d at 1329. Both of the majority's inconsistent holdings are incorrect. Indeed, the majority's new position is unsupported by the record, for InterDigital does not assert that these patents are licensed to Nokia for use by industry in Finland (or any other country). As I discuss post, the legislative history shows no contemplation, much less ratification, of providing access to the ITC’s remedy of exclusion based on licensing of foreign manufacture. The statute requires “an industry in the United States, relating to the articles protected by the patent [to] exist[ ] or [be] in the process of being established.” 19 U.S.C. § 1337(a)(2). The purpose is to protect United States industry, not as an incentive to industry in foreign countries.

. The panel majority makes the statement that Chairman Kastenmeier "compromised” away the requirement that a domestic industry is practicing or intending to practice the patented invention. Rehearing Op. 1301-02. The majority states that the legislators intended, by explicit compromise, to eliminate any domestic manufacture requirement. The legislative record contains no reference to such a compromise, no proposal for such a compromise, no suggestion that such a compromise was achieved, no explanation that Section 337 is no longer concerned with domestic manufacture as a ground for excluding foreign manufacture. No witness commented on such a far-reaching compromise. It would be remarkable indeed if it were made, silently, without comment or reportage — unknown until today.

. A statutory amendment in 1994 renders it obligatory for a district court to stay a co-pending infringement action until the ITC proceeding is completed. 28 U.S.C. § 1659.

. No appeal has been filed as of this date.

. InterDigital reports that "substantially all of [its] revenue was derived from a limited number of licensees based outside of the United States, primarily in Asia.” InterDigital, Inc., Annual Report (Form 10-K), at 21 (Feb. 27, 2012). The majority now states that "[t]he record also reveals substantial investment by InterDigital in the research and development that led to the patents in suit.” Rehearing Op. 1299. This is inaccurate. While the ALJ made a general statement that InterDigital has been involved in research and development of wireless technology since 1993, Inter-Digital argued that it "satisfies the domestic industry requirement based on its licensing activities alone.” InterDigital did not provide evidence of research and development related *1317 to the patents in suit, and the record describes no relationship between research and development and licensing of the patents in suit. The only relationship asserted in this case is that the imported items, manufactured abroad by foreign industry, infringe United States patents. The licensing of foreign imports — whether by research institutions or universities — does not satisfy Section 337's domestic industry requirement.